## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FTE NETWORKS, INC.,<br><br>                           Plaintiff,<br><br>      v.<br><br>ADAR BAYS, LLC, ADAR ALEF, LLC,<br>ARYEH GOLDSTEIN, CHAIM VAIL, EAGLE<br>EQUITIES, LLC, ERAN ISRAEL, SAMUEL<br>EISENBERG, YAKOV BORENSTEIN, AND<br>THE JOHN DOE AND JANE DOE<br>INVESTORS<br><br>                       Defendants. | Civ. A. No.: |

## COMPLAINT

Plaintiff FTE Networks, Inc. ("FTE"), by and through its undersigned counsel, files this Complaint against Adar Bays, LLC, its affiliate Adar Alef, LLC (collectively, "Adar Bays"), Aryeh Goldstein, Samuel Eisenberg, Eran Israel (collectively, the "Adar Bays Principals"), Eagle Equities, LLC ("Eagle Equities" and together with Adar Bays, collectively, the "Companies"), Chaim Vail, Yakov Borenstein (the "Eagle Equities' Principals" and together with the Adar Bays Principal, collectively, the "Principals") and the John and Jane Doe Investors of the Companies (the "Investors" and together with the Companies, the Adar Bays Principals, and the Eagle Equities' Principals, collectively, the "Defendants" or the "Enterprises"), and, upon information and belief, alleges as follows:

## NATURE OF THE ACTION

1.     This is an action alleging fraud and conspiracy by two lender companies, controlled and manipulated by the Principals and Investors, to carry out a long-running scheme

to collect upon unlawful debts and otherwise fraudulently obtain thousands of dollars in funds from FTE in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Defendants entered into six so-called "4% Convertible Redeemable Notes" with FTE (the "Notes").  Although the title of the Notes reference a 4% interest rate, the purported form of the transaction was merely a sham to evade applicable usury laws.  The Notes permitted the Defendants to convert any or all of the outstanding balance of the loan into shares of FTE stock at a conversion price set at 65% of the stock's lowest trading price for the twenty prior trading days.  The Notes also contained significant hidden fees and prepayment penalties. In reality, the Notes were loans that charged interest rates that exceeded not less than 65%, rates that are far greater than the maximum 25% permitted under the laws of New York.

2.      Notes with "floating-price convertible options" has recently drawn scrutiny by New York's highest court in a matter involving one of the defendants here, Adar Bays.  In *Adar Bays, LLC v. GeneSYS ID, Inc.,* 37 N.Y.3d 320, 324, 179 N.E.3d 612 (2021), the New York Court of Appeals responded to two questions certified by the Second Circuit Court of Appeals in a matter concerning a convertible note issued by Adar Bays (similar to the Notes issued to FTE).

3.      In making its determination, the Court of Appeals acknowledged the long history of lenders attempting to avoid the enforcement of usury laws by disguising the loan in various alternative forms.  *Id*. at 338.  Specifically, with regard to convertible notes, the Court of Appeals indicated that "[i]f misused, the floating-price convertible option may constitute another form of usury cloaked in novel form."  *Id*.

4.      As to the first certified question, the Court of Appeals held that "the usury laws are implicated when a lender stipulates for a contingent benefit that, if exercised or triggered, has the potential to cause interest to accrue in amounts greater than the legal limit." *Id*. The Court of

Appeals specifically held that "the contingent nature of the option's exercise [does not] remove the loan from the scrutiny of the usury law," and as a result, courts must "assess the overall value of the conversion option at the time of the bargain." *Id*. at 338.

5.    As to the second certified question, the Court of Appeals affirmed that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Id*. at 333.

6.    As a result of the Court of Appeals' decision, the Second Circuit remanded the case for the district court to determine whether the note is usurious and, if the district court so determines, find the convertible note void *ab initio*. *Adar Bays, LLC v. GeneSYS ID, Inc.,* No. 18-3023, 2022 U.S. App. LEXIS 6591, at *1 (2d Cir. Mar. 15, 2022).

7.    In this instance, the Defendants took advantage by effectively robbing FTE's shareholders and its creditors of millions of dollars—in a period of just months.   Notably, at the time of these transactions, FTE, then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement.

8.    As a resolute of the stock conversion options, hidden fees, prepayment penalties, and other one-sided provisions in the Notes, the Defendants were able to disguise the usurious interest rates of the Notes, at rates of at least 65% annual interest.

9.    It is against this backdrop that Plaintiff files this Complaint.

## **THE PARTIES**

10.    FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.

11.    Adar Bays, LLC is a corporation organized under the laws of Florida with its principal place of business in Florida.

3

12.     Adar Alef, LLC is a corporation organized under the laws of Florida with its principal place of business in Florida.  Adar Alef, LLC is a corporate affiliate of Adar Bays, LLC and is managed by the same Principals.  Adar Alef, LLC was previously organized under the laws of New York with its principal place of business in New York County, New York. It was voluntarily dissolved in 2020 then re-registered in Florida in 2021.

13.     Aryeh Goldstein is a principal owner and member of Adar Bays and Adar Alef, and a citizen and resident of New York.

14.     Samuel Eisenberg is a principal owner and member of Adar Bays and Adar Alef, and a citizen and resident of Florida.

15.     Eran Israel is a principal owner and member of Adar Bays and Adar Alef, and a citizen and resident of Florida.

16.     Eagle Equities, LLC is a corporation duly organized under the laws of Nevada with its principal place of business located in Connecticut.

17.     Chaim Vail is a principal owner and member of Eagle Equities, and a citizen and resident of Connecticut.

18.     Yakov Borenstein is a principal owner and member of Eagle Equities, and a citizen and resident of Connecticut.

## **JURISDICTION**

19.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

21.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

**A.    General Background of FTE**

22.    At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings.   The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.

23.    In 2017, FTE needed additional financing.  To procure that financing, FTE turned lenders offering convertible notes and, in doing so, fell victim to the tactics described above.

**B.    The Adar Bays Notes**

24.     Over a six-month period between April 27, 2018 and November 5, 2018, FTE entered into three transactions with Adar Bays and the Adar Bays Principals.

25.    The first note was dated April 27, 2018.  The second note was dated May 13, 2018.  The third note was dated November 5, 2018.  These three notes (collectively, the "Adar Bays Notes") are attached hereto as **Exhibits A, B** and **C,** respectively and are incorporated herein as if set forth at length.

26.    All of the Adar Bays Notes are governed by and construed in accordance with the laws of the state of New York.

**C.    The Eagle Equities Notes**

27.     Over a six-month period between April 27, 2018 and November 5, 2018, FTE entered into three transactions with Eagle Equities and the Eagle Equities Principals.

28.     The first note was dated April 27, 2018.  The second note was dated May 13, 2018.  The third note was dated November 5, 2018.  These three notes (collectively, the "Eagle Equities Notes") are attached hereto as **Exhibits D**, **E** and **F**, respectively and are incorporated herein as if set forth at length.

29.     All of the Eagle Equities Notes are governed by and construed in accordance with the laws of the state of New York.

**D.     The Notes are Consistent with Predatory Practices by Other Lenders**

30.     Like many predatory lender companies, the Defendants prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Although the Notes are titled "4% Convertible Redeemable Notes," the purported form of the transaction was merely a sham to evade applicable usury laws.  The Defendants underwrite, market and collect upon their transactions as loans, with effective interest rates far above those permissible under New York law.

31.     Moreover, the Defendants did not even advance the full amount of the Notes, which was reduced by the Defendants for certain fees.  These fees include underwriting and origination fees, wire fees and processing fees.  Despite the title of these fees, the Defendants performed little or no due diligence and the actual costs of the processing costs were a fraction of the fees.  Indeed, in reality, these fees were merely additional disguised interest.

**E.     The Notes are Substantively and Procedurally Unconscionable**

32.     The Adar Bays Notes and the Eagle Equities Notes (collectively, the "Notes") are unconscionable contracts of adhesion that were not negotiated at arms-length.

33.     Instead, they contain one-sided terms, such as the convertible stock option, that prey upon the desperation of the business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans.

34.     The Notes are also unconscionable because they contain numerous knowingly false statements, are designed to fail, and contain numerous improper fees and penalties that violate New York's strong public policy of prohibiting usurious loans.

**F.     The Intent of the Defendants' Enterprise is to Issue Loans Using a Convertible Option to Disguise the Loans**

35.     In order to evade state usury laws, the Defendants include a floating price convertible option that permit the Defendants to convert any or all of the outstanding balance of the loan into shares of FTE stock at a conversion price set at 65% of the stock's lowest trading price for the twenty prior trading days.

36.     Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.

37.     New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Defendants.  The Defendants had the sole option to convert the loan into stock at a fixed discount. Defendants will always be able to receive more on each dollar it converts into stock because the discount has been reserved explicitly in the Note at the time the Load was entered into.

38.     The value of the shares reserved to Defendants at the time of the Loans is interest under NY law and clearly violates the New York's Criminal Usury Laws.

**<u>FIRST CAUSE OF ACTION</u>**
**(RICO:  18 U.S.C. § 1962)**

39.     Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

40.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

41.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

42.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

43.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

44.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

45.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

46.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

47.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

48.     The Principals and the Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

49.     At all relevant times, each of the Principals and the Investors was, and is, a person that exists separate and distinct from the Enterprise.

50.     Principals have an ownership interest in the Companies and is the mastermind of the Enterprise.

51.     The Investors are individuals and business entities that provide funding for the criminally usurious and unenforceable loans made by the Enterprise.

52.     Through their operation of the Companies, the Enterprise solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

53.     The Principals, the Companies, and the Investors constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

54.     The Principals, the Companies, and the Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

55.     Beginning since 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of

originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

56.     The debt, including such debt evidenced by the Notes, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.  Under New York law, agreements that are usurious are void and unenforceable.

57.     The Notes (attached and incorporated as **Exhibits A – F**) have minimum effective annual rates of 65% to 91%, as evidenced by the attached summary, attached hereto as **Exhibit G** and incorporated herein as if set forth at length.

58.     Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

59.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

60.     The Principals, the Companies, and the Investors have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

61.     The Principals are the owners and masterminds of the Enterprise.   They responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of the Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

62.     In the Principals' capacity as the masterminds of the Enterprise, the Principals are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt.

63.     The Principals have also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

64.     The Principals have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Companies and to the Investors and the Principals further benefit from the receipt of distributions and payment of salary or commissions by the Companies.

65.     The Principals and the Investors have operated the Companies as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, the Companies has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors

to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called convertible notes on behalf of the Enterprise; (v) serviced the usurious loans; and (vi) obtained judgments in its name to further collect upon the unlawful debt.

66.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the Companies and the Principals.

67.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Companies with all or a portion of the pooled funds necessary to knowingly fund the usurious loans, including the Notes, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

68.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

69.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

70.    Specifically, members of the Enterprise use personnel in their office to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

71.     FTE has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

72.     The injuries to FTE directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to improperly collected criminally usurious loan payments.

73.     Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

74.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

### SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

75.     Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

76.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

77.     By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

78.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

79.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

80.     The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

81.     Plaintiff has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

82.     The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

83.     Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

84.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in their favor against Defendants, jointly

and severally, and seek a judgment:

a)      Declaring each of Plaintiff's agreements with Defendants to be a usurious
loan in violation of New York Penal Law §190.40 and thus void and
unenforceable;

b)      Awarding compensatory, direct, and consequential damages, including
prejudgment interest, in an amount to be determined at a hearing;

c)      Awarding treble damages;

d)      Requiring Defendants to pay Plaintiff's attorneys' fees and costs; and

e)      Any further relief deemed appropriate by the Court.

Dated:  April 26, 2022

                    WHITE AND WILLIAMS LLP

                    By:_____
                    Shane R. Heskin
                    7 Times Square, Suite 2900
                    New York, NY 10036-6524
                    (215) 864-6329
                    heskins@whiteandwilliams.com
                    *Attorneys for Plaintiffs*